# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

v.                                                          CR No. 99-1195 JP

**JERRY PARADA and**
**KENNETH MARTINEZ,**

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

On November 17, 1999 Defendant Martinez filed a Motion to Quash Arrest, (Doc. No. 34), a Motion to Suppress Evidence, (Doc. No. 36), a Motion to Dismiss Indictment, (Doc. No. 30) and a Motion for Severance of Defendants, (Doc. No. 32). On January 5, 2000 Defendant Parada filed a Motion to Suppress Evidence, (Doc. No. 58), and a Motion to Suppress Statements, (Doc. No. 59). After holding an evidentiary hearing on January 18, 2000 and reviewing the motions, the applicable law, and the post-hearing correspondence of counsel, I conclude that Defendant Martinez' Motion to Suppress Evidence, Defendant Martinez' Motion to Quash Arrest, Defendant Parada's Motion to Suppress Evidence, and Defendant Parada's Motion to Suppress Statements should be denied.

# FACTS

At the hearing, two witnesses testified for the Government. Their testimony established the following facts.

In May 1998 the Government began an investigation into the drug activities of Javier Barron, who was a part-owner of Sun City Auto Sales ("Sun City") in Albuquerque, New Mexico. On February 25, 1999 a confidential informant purchased drugs from Mr. Barron.[1] At Mr. Barron's direction, the confidential informant left the cash for the purchase under a sofa cushion at Sun City. Mr. Barron instructed Jorge Perez[2] to deliver the cocaine to the confidential informant a block away from Sun City, which he apparently did. An undercover agent and the confidential informant subsequently negotiated, apparently with Mr. Barron, for the purchase of a half kilo of cocaine. At some point, the undercover agent and confidential informant negotiated with Mr. Barron for an ounce of cocaine. On March 9, 1999 the undercover agent and the confidential informant met with Mr. Perez at American Furniture near Carlisle and I-40 and directly exchanged money for the ounce of cocaine, which Mr. Perez said was representative of what the half kilo would be like. On March 26, 1999, Mr. Barron met with the confidential informant and the undercover agent at Sun City. Mr. Barron instructed them to leave the cash for the drug transation in a trash can in the bathroom and said that Mr. Perez would deliver the cocaine. Mr. Perez then followed the undercover agent and the confidential informant to a nearby McDonald's and delivered the half kilo of cocaine.

On May 14, 1999, DEA Special Agent Art Cantu was conducting surveillance at Sun City.

---

[1] Mr. Barron is a defendant in CR No. 99-1178 BB.

[2] Mr. Perez is also a defendant in CR. No. 99-1178 BB.

2

He followed Mr. Barron to Enchantment Auto Sales ("Enchantment Auto"), which is located in Albuquerque, New Mexico near the intersection of Lomas and Washington streets. From Agent Cantu's location at a gas station, almost directly across the street from Enchantment Auto, he saw Mr. Barron park his car on a side street next to Enchantment Auto. Mr. Barron walked towards a group of men on the lot of Enchantment Auto. Agent Cantu then observed two men leave the group at separate times and walk over to Mr. Barron's red Bronco. Each man opened the door on the driver's side of the red Bronco, pushed the seat forward, and appeared to be looking at something directly behind the driver's seat. Agent Cantu testified that in his experience these actions were consistent with people trying to verify the presence of drugs or money to pay for drugs. Agent Cantu could not identify either of the two individuals as Defendants Martinez or Parada. Each man returned to the group. Later, Agent Cantu saw Defendants Martinez and Parada emerge from the Enchantment Auto office building with a black duffle bag. The Defendants climbed into a tan Lexis while Mr. Barron got into his red Bronco. The two vehicles drove in tandem across the street to the gas station where Agent Cantu was conducting his surveillance. Agent Cantu testified that the Defendants gave him a "hard look," which made Agent Cantu suspect that the Defendants had observed him conducting surveillance.

Agent Cantu observed Defendants and Mr. Barron leave the gas station in their respective vehicles and drive north on Washington. At the same time, he observed Albuquerque Police Officer Catherine Garduño making a traffic stop at the Lomas and Washington intersection. He approached Officer Garduño and told her that he had witnessed behavior consistent with drug trafficking with a known drug dealer. Agent Cantu asked Officer Garduño to initiate a stop of the tan Lexis, but not of the red Bronco, and ask for identification of the occupants. Agent Cantu did

3

not tell Officer Garduño that the Defendants were armed and dangerous, and he did not ask her to arrest them. Officer Garduño immediately terminated her traffic stop and began following the red Bronco, which was following the tan Lexis. She also called for backup because in her training and experience she knew that it was common for drug traffickers to carry weapons.

According to Officer Garduño's testimony, she followed the two cars northbound on Washington and then eastbound on Constitution. She noticed the tan Lexis begin "pulling away" from the red Bronco and speeding up to fifty miles an hour on Constitution although the posted speed limit was thirty miles an hour. At the intersection of San Mateo and Constitution, the tan Lexis passed through the light and began driving northbound on San Mateo before the red Bronco and Officer Garduño reached the intersection. When the light turned yellow, the red Bronco stopped and Officer Garduño engaged her emergency lights to go around the red Bronco and pass through the intersection. Two other police vehicles began following behind Officer Garduño, each with their emergency lights on. The tan Lexis soon turned off of San Mateo to a side street and stopped, and the officers parked their vehicles behind it.

Officer Garduño testified that she asked Officer Koehnke, who had been traveling in one of the other police cars, to use his PA system to do a felony stop and order the Defendants to put their hands up. Officer Garduño's report, however, stated that she asked the Defendants to put their hands out the windows. Following the command, the Defendants put their hands out the windows of the tan Lexis. Officer Garduño and Officer Aubuchon approached the tan Lexis with their hands on their holstered weapons. The Officers never unholstered their weapons. When the officers were standing about a foot behind the tan Lexis, they both smelled marijuana. The officers asked the Defendants to step out of the car. A pat-down of the Defendants revealed that

4

each Defendant had approximately one ounce of cocaine in his pocket. Officer Garduño also spotted a large box in the backseat of the car. When she opened it she found what was later determined to be approximately forty pounds of marijuana.

## DISCUSSION

### Motions to Suppress Evidence

Defendants argue that the evidence seized must be suppressed because there were no specific and articulable facts to justify a *Terry* stop.[3] Having reviewed the facts, I conclude that the officers had reasonable suspicion to conduct a *Terry* stop based on Agent Cantu's knowledge and observations. *See Terry v. Ohio*, 392 U.S. 1 (1968) (holding that officer had reasonable suspicion to conduct a brief investigatory detention of suspects pacing during daylight hours in front of store windows and staring in one window approximately twenty-four times); *Illinois v. Wardlow*, --- U.S. --- , 120 S.Ct. 673 (2000) (holding that officers had reasonable articulable suspicion for *Terry* stop when suspect fled from officers patrolling in high crime neighborhood).

Officer Garduño also had reasonable suspicion to stop Defendants on the independent ground that she observed the Defendants driving fifty miles an hour in a posted thirty miles an hour zone. *See Whren v. United States*, 517 U.S. 806, 813 (1996) ("Subjective intentions play no role in ordinary probable-cause Fourth Amendment analysis.").

Defendant Parada also argues that the officers escalated the stop into an illegal arrest without probable cause. "Once police officers make a stop based on reasonable suspicion, the scope of that stop must be 'reasonably related in scope to the circumstances which justified the

---

[3] The Government does not contest the Defendants' standing to challenge the search of the Lexis.

5

interference in the first place.'" *United States v. Melendez-Garcia*, 28 F.3d 1046, 1051 (10th Cir. 1994) (citing *Terry*, 392 U.S. at 20). When officers make a *Terry* stop, "they [are] authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). Most courts "have held that police actions in blocking a suspect's vehicle and approaching with weapons ready, and even drawn, does not constitute an arrest per se." *United States v. Edwards*, 53 F.3d 616, 619 (3d Cir. 1995). "The Supreme Court has long allowed de minimus intrusions on the liberty of a person detained by a *Terry* stop to advance officer safety, such as a frisk for weapons or a request to step out of the car during a traffic stop." *Melendez-Garcia*, 28 F.3d at 1052. Although Defendant Parada makes much of the fact the officers asked Defendants to put their hands out the windows of the car instead of in the air, whether a defendant is free to leave the scene "does not mark the point where a *Terry* stop escalates into an arrest, since in neither a stop nor an arrest is a suspect free to leave." *Edwards*, 53 F.3d at 619. Once the officers smelled the marijuana while walking up to the tan Lexis, they had probable cause to search the passenger compartment of the Lexis. *See United States v. Parker*, 72 F.3d 1444, 1450 (10th Cir. 1995). Therefore, Defendants' motions to suppress should be denied.

Defendant Martinez' Motion to Quash Arrest and Defendant Parada's Motion to Suppress statements should also be denied because they are based on the same arguments presented in their motions to suppress evidence.

## Motion for Severance of Defendants

At the hearing, I stated that I would not rule on Defendant Martinez' motion to sever until he submitted an affidavit from Defendant Parada. Defendant Martinez has not yet submitted the requested affidavit. I will deny Defendant Martinez' motion to sever at this time, although I will reconsider it if he submits an affidavit from Defendant Parada.

## Motion to Dismiss Indictment

Defendant Martinez contends that the Government failed to comply with the Court's October 28, 1999 Order requiring the Government to produce within eight days the information required by Fed. R. Crim. P. 16. According to his motion, *no* information had been provided to Defendant Martinez by November 17, 1999. However, this statement contradicts another statement made in Defendant's simultaneously filed motion to sever where he states, "[f]rom the discovery that defendant *has reviewed* . . . ." The Government denies that it violated the Court's October 28, 1999 Order or Fed. R. Crim. P. 16.

Because Defendant Martinez did not raise this motion at the hearing, I assume that it is moot. If Defendant Martinez requires a ruling on this motion, however, he should inform the court and a hearing will be scheduled.

IT IS THEREFORE ORDERED that:

1. Defendant Martinez' Motion to Suppress Evidence, (Doc. No. 36), Motion to Quash Arrest, (Doc. No. 34), and Motion for Severance of Defendants, (Doc. No. 32), are DENIED;

2. Defendant Parada's Motion to Suppress Evidence, (Doc. No. 58), and Motion to Suppress Statements, (Doc. No. 59), are DENIED.

_____
UNITED STATES DISTRICT JUDGE